UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | **Mag. Judge Case No.** |
| ) | 04-M- 273 JLA |
| JOSE ALFREDO TAPIA ) | |
| **Defendant** ) | |

## AFFIDAVIT IN SUPPORT OF ARREST

I, Shawn A. Murray, Task Force Agent, Drug Enforcement Administration, do hereby make oath before the Honorable Joyce London Alexander, United States Magistrate Judge for the District of Massachusetts, that upon knowledge coming to me in connection with my official duties and as part of the official records of my office, I am advised that there is presently outstanding a warrant of arrest for one Jose Alfredo Tapia, on a complaint filed in the Western District of Texas charging the defendant with conspiracy to distribute, and to possess with intent to distribute, marijuana, in violation of 21 U.S.C § 846, and I do hereby make oath that this warrant of arrest is outstanding in said District on the basis of the information set out above. A copy of said warrant is attached.

_____
SHAWN A. MURRAY
Task Force Agent
Drug Enforcement Administration

Subscribed and sworn to before me this 18th day of November, 2004.

_____
JOYCE LONDON ALEXANDER
United States Magistrate Judge

# United States District Court

FILED
NOV 0 9 2004
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

WESTERN _____ DISTRICT OF _____ TEXAS

UNITED STATES OF AMERICA
V.
TAPIA, JOSE ALFREDO

## WARRANT FOR ARREST

CASE NUMBER: 04-5014-G

To: The United States Marshal
and any Authorized United States Officer

YOU ARE HEREBY COMMANDED to arrest  JOSE ALFREDO TAPIA
                                      Name

and bring him or her forthwith to the nearest magistrate to answer a(n)

☐ Indictment   ☐ Information   ☒ Complaint   ☐ Order of court   ☐ Violation notice   ☐ Probation Violation Petition

charging him or her with (brief description of offense)

knowingly and intentionally conspiring to possess with the intent to distribute a quantity of marijuana in excess of 100 kilograms, to wit approximately 1500 pounds, a Scheduled I Controlled Substance

in violation of Title  21  United States Code, Section(s)  846

Norbert Garney                          United States Magistrate Judge
Name of Issuing Officer                  Title of Issuing Officer

[signature]                              11-10-04  El Paso, Tx.
Signature of Issuing Officer             Date and Location

Bail fixed at $ _____  by _____
                                  Name of Judicial Officer

| RETURN |
|---|
| This warrant was received and executed with the arrest of the above-named defendant at _____ |

| DATE RECEIVED | NAME AND TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |
|---|---|---|
| DATE OF ARREST | | |

# United States District Court

_____ DISTRICT OF _____

FILED
NOV 0 9 2004
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____ DEPUTY CLERK

UNITED STATES OF AMERICA
V.

SEE ATTACHMENT A

(Name and Address of Defendant)

## CRIMINAL COMPLAINT

CASE NUMBER: 04-5014-G

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or July 26 to August 10 2004 in El Paso County, in the Western District of Texas defendant(s) did, (Track Statutory Language of Offense)

knowingly and intentionally conspire to possess with the intent to distribute a quantity of marijuana over 100 kilograms, to wit approximately 1500 pounds, a Schedule I Controlled Substance

in violation of Title 21 United States Code, 846

I further state that I am a(n) Special Agent
                                 Official Title
and that this complaint is based on the following facts: see Attachment B: Affidavit In Support of Application for Arrest Warrants

Continued on the attached sheet and made a part     ☒ Yes    ☐ No

_William D. Massey, Special Agent_
Signature of Complainant

Sworn to before me, and subscribed in my presence,

11-9-04                                      at El Paso, Texas
Date                                            City and State

_Norbert Garney,_ United States Magistrate Judge
Name and Title of Judicial Officer                Signature of Judicial

## ATTACHMENT A

CUGNO, MICHAEL F.

TAPIA, JOSE ALFREDO

VASQUEZ-ACOSTA, GERALDO
AKA: GERALDO ACOSTA VASQUEZ
JERRY VASQUEZ
STAR

SCHUKO, STEPHEN W.

LAUREANO, LAURENTINO JORGE

ATTACMENT B

AFFADAVIT IN SUPPORT OF APPLICATION FOR ARREST WARRANTS

Your Affiant, Special Agent (SA) William D. Massey, being duly sworn, declares and states:

1. I am a Special Agent of the Drug Enforcement Administration (DEA) and have been so employed for over twenty years. I am currently assigned to the El Paso Field Division, Enforcement Group 1. My duties include the investigation of local, national, and international transporters, distributors, and sellers of illegal drugs. I have received specialized training throughout my career with DEA regarding the manufacture, smuggling, distribution, and sale of illicit drugs.

2. As a Special Agent with DEA I have participated in many investigations of illicit drug with local, national, in international scope and impact. My roles have varied in these investigations from being a surveillance team member to acting as a supervisor of an entire group of agents conducting a criminal investigation. My authority to conduct criminal investigations related to illegal drug statutes comes from the authority of Attorney General of the United States as provided by Title 18 and Title 21 of the United States Code (USC).

3. Regarding the facts as outlined below, I have personal knowledge of some of the facts and have conducted interviews and been provided reports by other Special Agents and law enforcement officers regarding facts not directly known by your Affiant.

4.  Beginning on, or about, July 26, 2004, in El Paso, TEXAS, which is in the Western District of Texas, Special Agent Todd Shea, acting in an undercover capacity, spoke with Alejandro Garcia-Lozado regarding the transportation of approximately 55 kilograms of cocaine from El Paso, TEXAS to the New York, NEW YORK area. After several meetings and telephone calls, an individual later identified as Cesar Trevizo, met with SA Shea and delivered the cocaine to SA Shea as directed by Garcia-Lozado at a restaurant parking lot in El Paso, TEXAS. Between July 26, 2004 and July 28, 2004, SA Shea continued to have telephone conversations with Garcia-Lozado about the delivery of the cocaine to New York, NEW YORK. During these conversations, Garcia-Lozado inquired of SA Shea, if SA Shea knew of anyone that would be interested in transporting a quantity of marijuana for Garcia-Lozado.

5.  SA Shea utilized this opportunity to introduce a second Special Agent to Garcia-Lozado. On, or about, July 28, 2004, SA Daktor Holguin, acting in an undercover capacity, spoke with Garcia-Lozado. Garcia-Lozado told SA Holguin that he (Garcia-Lozado) had a quantity of marijuana that he (Garcia-Lozado) wanted to have transported from El Paso, TEXAS to New York, NEW YORK. SA Holguin was instructed by Garcia-Lozado to meet some of Garica-Lozado's associates in El Paso, TEXAS.

6.  On, or about, July 29, 2004, SA Holguin met Cesar Trevizo at an eastside El Paso, TEXAS gas station. Eventually, SA Holguin met two other individuals (though Trevizo), Cesar Calvillo and Omar Calvillo. The Calvillo's took SA Holguin to a warehouse where twenty cylinders were provided to SA Holguin. According to information provided by Garcia-Lozado, the cylinders contained approximately 700 pounds of marijuana, and Holguin was to transport the cylinders to New York, NEW YORK.

7.  Between July 29, 2004, and August 9, 2004, SA Shea and SA Holguin had several telephone conversations with Garcia-Lozado about the delivery of the transportation and delivery of the marijuana. Eventually, SA Holguin was given a contact telephone number to a person identified as "Star" later identified as Gabriel Vasquez-Acosta. SA Holguin contacted Vasquez-Acosta via telephone and was told that the marijuana was not supposed to be delivered to New York, NEW YORK but instead to the Boston, MASSACHUSETTS area. Based on the conversations between SA Holguin, SA Shea, Garcia-Lozado, and Vasquez-Acosta and in an effort to continue the undercover operation and complete the delivery to Boston, MASSACHUSETTS, the marijuana was turned over by SA Holguin to SA Shea for delivery to Boston, MASSACHUSETTS.

8.  Between July 29, 2004 and August 9, 2004, Garcia-Lozado told SA Shea that he was paying individuals from Arizona to meet SA Shea in Massachusetts to take delivery of the cylinders containing the marijuana. SA Shea contacted "Star" (Geraldo Vasquez-Acosta), and set up meeting between the two, which took place on August 9, 2004, at a Citgo Gas Station in Wrenthem, MASSACHUSETTS. Vasquez told SA Shea to follow a green colored Range Rover when it arrived at SA Shea's location. Vasquez-Acosta told SA Shea that he (Vasquez-Acosta) would be driving a red colored Pontiac Grand-Prix.

9.  At approximately 11:20 PM, on August 29, 2004, SA Shea observed the Range Rover arrive across the street from the Citgo Gas Station. SA Shea observed that the vehicle was occupied by two people. The driver of the Range Rover was later identified as Michael F. Cugno. As the Range Rover arrived, SA Shea was on the telephone with Vasquez-Acosta, who asked SA Shea what vehicle SA Shea was driving. Vasquez-Acosta instructed SA Shea to follow the Range Rover. Shortly after the Range Rover arrived, SA Shea departed the Citgo Gas Station, almost immediately receiving a telephone call from Vasquez-Acosta who wanted to know

where SA Shea was going. SA Shea told Vasquez-Acosta that he was traveling north on Route 1, at which time SA Shea provided a secondary location, the End Zone Sports Bar, where they could meet.

10. At approximately 11:25 PM, SA Shea arrived at the End Zone Sports Bar, parking in the parking lot. Almost immediately Vasquez-Acosta arrived in the Pontiac Grand-Prix, parking next to SA Shea's vehicle. Through the open windows, Vasquez-Acosta introduced himself as "Jerry." SA Shea observed a passenger in the Grand-Prix, later identified as Stephen W. Schuko.

11. Vasquez-Acosta inquired where SA Shea had parked the truck that contained the cylinders that contained the marijuana. SA Shea inquired of Vasquez-Acosta if Vasquez-Acosta has approximately $43,000 that was supposed to be paid to SA Shea for transporting the marijuana. Negotiations continued between SA Shea and Vasquez-Acosta in which Vasquez-Acosta wanted SA Shea to drive the truck that contained the cylinders of marijuana to a warehouse. SA Shea refused to complete the delivery until he (SA Shea) was paid the $43,000 for the transportation of the cylinders from El Paso, TEXAS to the Boston, MASSACHUSETTS area. All the negotiations were conducted in the presence of Schuko. During part of the conversation, Schuko joined the conversation telling SA Shea that the agreement had been that SA Shea would drive the truck containing the cylinders to the warehouse. Vasquez-Acosta eventually conceded and said he would make arrangements to have the truck driven to the warehouse. Vasquez-Acosta and Schuko departed the area in the Grand-Prix. Special Agents conducting surveillance of the meeting between SA Shea and Vasquez-Acosta observed the Range Rover in the area while the meeting was being conducted. The occupants of the Range Rover and the occupants of the Grand-Prix met up after the meeting between SA Shea and Vasquez-Acosta ended. Your Affiant knows that it is very common practice for drug traffickers to have someone conduct counter-

surveillance during illicit drug negotiations and deliveries, to possibly identify any law enforcement officers that might be in the area and to also provide security for the illegal drugs and any drug related currency that might be involved in the transaction.

12. At approximately 11:35 PM, Vasquez-Acosta returned to the End Zone Sports Bar parking lot. This time Vasquez-Acosta was alone, but still driving the Grand-Prix. SA Shea approached Vasquez-Acosta's vehicle at the driver side windows and engaged Vasquez-Acosta in conversation. Vasquez-Acosta handed SA Shea a brown paper bag that Vasquez-Acosta claimed to contain $40,000. SA Shea looked in the bag and confirmed that the bag contained US Currency.

13. Vasquez-Acosta then contacted Garcia-Lozado from his (Vasquez-Acosta) cellular telephone. Vasquez-Acosta was complaining to Garcia-Lozado that SA Shea would not drive the truck containing the cylinders to the warehouse for Vasquez-Acosta. Vasquez-Acosta then handed the cellular telephone to SA Shea. Garcia-Lozado instructed SA Shea to drive the truck to the warehouse. SA Shea refused to drive the truck as instructed by Garcia-Lozado. SA Shea handed the telephone back to Vasquez-Acosta, who told Garcia-Lozado that he (Vasquez-Acosta) would drive the truck himself. Vasquez-Acosta terminated the call with Garcia-Lozado and then told SA Shea to take him (Vasquez-Acosta) to where the truck was parked. SA Shea departed the parking lot followed by Vasquez-Acosta.

14. Vasquez-Acosta followed SA Shea to the truck that contained the cylinders of marijuana was parked. SA Shea gave Vasquez-Acosta the keys to the truck and the lock on the back door. SA Shea departed the area. Vasquez-Acosta also departed the area, leaving the truck parked where it was. Surveillance followed Vasquez-Acosta to a McDonald's Restaurant parking lot where Vasquez-Acosta met up with the occupant of the Range Rover

15. At approximately 12:00 AM on August 10, 2004, the Grand-Prix that had been driven by Vasquez-Acosta earlier returned to the truck that contained the cylinders of marijuana. An unidentified subject exited the Grand-Prix and approached the truck. The two vehicles were observed to leave the restaurant parking lot, joined momentarily by the Range Rover. While traveling to the final destination in Stoughton, MASSACHUSETTS, the Grand-Prix and Ranger Rover followed a different route to get to the same location as the truck carrying the cylinders of marijuana. The truck arrived at a warehouse at approximately 12:15 PM, while the Range Rover and Grand-Prix arrived at approximately 12:20 PM. The truck was backed up to the loading dock of the warehouse, and the two other vehicles were parked nearby.

16. As two unmarked DEA vehicles approached the warehouse, Special Agents observed several people in the warehouse running, as if trying to escape. Other Special Agents and Task Force Officers were called in to secure the warehouse area. As the officers arrived, two individuals, Geraldo Vasquez-Acosta and Michael F. Cugno, were found near the loading dock area. Both subjects were immediately detained.

17. As the officers continued to secure the inside of the warehouse, announcing their presence and their identity as law enforcement officers, a subject, later identified as Jose Tapia, ran up a set of stairs. Tapia refused to follow the commands of the officers to stop running. A search of the upstairs area located Tapia hiding behind some equipment. Tapia was detained and taken out of the warehouse.

18. As officers continued their security sweep of the inside of the warehouse, a burglar alarm was activated. Officers found a door the led to a separate, but

connected, office space. The door had been opened, causing the alarm to activate. A search of this office space located Stephen W. Schuko in the kitchen area of this office space. Schuko was removed from the warehouse.

19. As officers continued to secure the warehouse, a canine was brought in to assist in locating additional individuals. The canine located Laurentino Laureano hiding in the loft area.

20. Inside the building near, the loading dock where the truck that contained the cylinders of marijuana was parked, were eight of the twenty cylinders. The eight cylinders had been placed by the adjacent loading dock, where a Budget Rental truck was parked. This loading dock door had been opened, as had the rear cargo door of the Budget Rental truck. It was found that the Budget Rental truck had been rented by Michael Cugno.

21. Each person in the building was questioned individually and specifically asked why they had run when the officers approached the warehouse.

22. Laureano stated that he was friends of the person that managed the business and identified this person as Jack Grieco. Laureano provided a contact telephone number for Grieco. Laureano claimed to have the keys to the building and occasionally worked there loading and unloading trucks. Laureano stated that Grieco did not know that he (Laureano) was at the warehouse, but insisted that he did not need Grieco's permission. Laureano admitted that he was there to help a friend unload the canisters from a truck and load them into another truck. Laureano refused to identify his friend, refused to identify the driver of either truck, and said he didn't know what was contained in the canisters. Laureano claimed he ran because everyone else did.

23. Vasquez-Acosta stated he had come to the warehouse to drink some beers with a friend. Vasquez-Acosta refused to identify this friend.

24. Tapia stated that he had come to the warehouse with Vasquez-Acosta to meet up with a friend. Tapia refused to identify this friend. Tapia provided that he and Vazquez-Acosta had traveled from Arizona to Massachusetts and were staying at a motel. Tapia claimed he couldn't identify which town the motel was located in. Tapia provided that Vazquez-Acosta had rented the Grand-Prix. Tapia stated that he ran when the law enforcement officers arrived because everyone else ran.

25. Schuko stated that he did not know what was going on and didn't want to make any statements without talking to an attorney.

26. Cugno refused to answer any questions, including questions related to his identity.

27. None of the five individuals encountered at the warehouse claimed ownership of the cylinders or the truck used to deliver the cylinders to the warehouse. A drug alerting canine alerted to the cylinders both in the warehouse and in the truck. A small hole was cut in one of the cylinders revealing a green leaf like substance, suspected to be marijuana. It should be noted that when the marijuana was seized in El Paso, TEXAS, one of the cylinders, was opened. Green leafy substance was found inside the cylinder and tested for marijuana by SA William Massey. The results of the test were positive for marijuana.

28. All five subjects were placed under arrest for violation of Massachusetts controlled substances laws.

29. A search of Cugno revealed the keys that SA Shea had provided to Vazquez-Acosta for the truck, as well as the padlock. Both items were found in Cugno's pants pocket. Cugno is the registered owner of the Range Rover described in the above events.

30. A search of Vasquez-Acosta resulted in the finding of $5,000 US Currency. Found inside the Grand-Prix was an additional $5,000 US Currency. Also found in the Grand-Prix was the rental agreement for the vehicle, rented in the name Jerry Vasquez. Found on Vasquez-Acosta's person was a piece of paper with number 508/631-9139 written on it. This number was the same number as assigned to the cellular telephone taken from Schuko. Also found on Vasquez-Acosta's person was a handwritten note providing the directions to the Citgo Gas Station where Vasquez-Acosta and Schuko met with SA Shea.

31. Found in the Range Rover was a small blue notebook. Written on the first page were the name "Jerry" and the telephone number "520/248-2292." This number was the telephone number assigned to the cellular telephone taken from Velazquez-Acosta. The name "Jerry" is the name used by Velazquez-Acosta when he introduced himself to SA Shea, and the first name used by Velazquez-Acosta when he rented the motel room in Norwood, MASSACHUSETTS. It is also the name used by Vasquez-Acosta when he rented the Grand-Prix.

32. All twenty cylinders were eventually cut open. All the cylinders contained marijuana, with the total weight of the marijuana removed from the twenty cylinders to be a few pounds over 1500 pounds.

33. Based on the above information it is your Affiant's belief that Geraldo "Jerry" Vasquez-Acosta, Jose Alfredo Tapia, Michael F. Cugno, Laurentino Jorge Laureano, Stephen W. Schuko, and others possessed and conspired to distribute a

quantity of marijuana over 100 kilograms, to wit 1500 pounds of marijuana, all in violation of Title 21 USC Sections 846.